Good morning, your honors. Richard Rainer for Appellant Abdul Garba. I was also trial counsel. I'd like to reserve two minutes for rebuttal, and I'm prepared to discuss three issues, and Ms. Young, counsel for Ms. Anyazi-Smith, is prepared to discuss the remaining issues. Did you decide to split time evenly? Yes, your honor. And your honor, the issues that I'm prepared to discuss are profiling, overpayment letter, and sufficiency. And your honor, first I'd like to address the issue of profiling and the profiling evidence. Now, it's interesting to see how the claim that evidence is modus operandi testimony comes together with whether or not it's prohibited profile evidence, because many times there seems to be an argument, where does one start, where does one end? And I think it's important to look at why modus operandi testimony is admissible. And basically, you have somebody in law enforcement who has experience dealing with a particular type of crime, has familiarity, and they may see things like, for example, counter surveillance, where somebody's driving in a particular way, and they understand that that's actually a criminal method. And it's something that could be helpful to a jury. And in those instances, it's permissible. But then there are other things where essentially it's things that may be a reason to investigate. And that's something that oftentimes it will come in a description of, we have these things that are red flags, and then you have the experts say, look, these are the red flags, A, B, and C, and then you have testimony that it's A, B, and C is proved. Now, what I would suggest is, in this case, maybe there are some things that could be properly considered modus operandi testimony, but there certainly were things that were profile testimony and improper. What portions of the expert's testimony would you say demonstrates profile evidence? Profile evidence, Your Honor, I would say that the most prejudicial and inappropriate one was where the agent Coons testified that it's very rare for a durable medical equipment company to supply a power wheelchair. So in a legitimate setting, what you have is the durable medical equipment might supply one a month, or maybe one every two months. And so he's basically saying, look, this is the profile of a legitimate company, and this does not fit the profile of a legitimate company, therefore it's fraudulent. And the reason that that is so important and why it's improper is that Mr. Garba's company sold many more than one a month, and it was somewhere around five a month. And this is something where the jury could have said, well, look, here's somebody who specializes in fraud, in fraud investigation. He should know, and he's said that this is a red flag and that a legitimate company would not be selling that many. But you have to ask yourself, what's his basis for that? The whole reason for allowing modus operandi testimony is because that agent knows about how those particular crimes are committed. But this, what he's talking about in terms of the numbers of power wheelchairs sold by a legitimate durable equipment company, what is the basis for that information? It's not his experience in criminal investigation, because in the legitimate setting, he's actually only looked at one durable medical equipment company that had power wheelchairs. And he never looked at their claims data, and he never looked at who their beneficiaries were. And so even though he talked about what the claims data would look like for a legitimate company, he's never looked at the claims data for a legitimate company. And he said that, and that's what makes this, I think, easier in terms of figuring out what's the distinction between modus operandi and profile. It's much easier in this instance, because he's talking about stuff that it's nonsense and not based upon any reliable type of method. He's talking about, look, I've talked to some durable medical equipment suppliers. But when you actually drill down into what he actually knew, it was, he visited three different suppliers. Two of them were specialty shops that wouldn't have had power wheelchairs. And so basically, he's just looking at that one. He's taking that profile of what a legitimate supplier looks like and what they would have, and then saying, well, because Mr. Garba's company didn't have that, that it's fraudulent. And especially given the way that it was offered in this case, if you look at the way that the government kind of tied this all together, in their opening, the government said, you're also going to hear from a federal agent who's going to explain how all these health care frauds typically work, then list a number of factors, and then it says, all are typical of health care fraud, and the evidence will show all of these things the defendants did. So they're saying, look, agent's going to say characteristics of fraud are A, B, C, and D, and the evidence is going to prove A, B, C, and D. And then in closing argument, the government says, you heard from Special Agent Koontz about all this stuff that we've just been talking about, everything you've heard over the past two weeks, and all of those are red flags of Medicare fraud schemes. And then further on in the closing argument, they say, the government argues, now you heard during the trial from Special Agent Keith Koontz about DME fraud schemes and how they typically work, but he also told you about how legitimate DME process is supposed to work, let's talk about that. And then they talk about the various things, the way their claims data is supposed to look, they should have a wide variety. But again, he's never looked at this claims data, and yet he's talking about it. It's not within his expertise, it's not the type of thing that falls within modus operandi. Judge Gould, if I could interject. Yes, thank you. Given that there's other evidence in the record that might, argued, relate to fraud, is that other evidence significant or relevant to question whether a trial judge abused his discretion? Yes, Your Honor. I would say, when we filed our motion for bond pending appeal, we put before Judge G the issues that, this very issue of the profiling evidence. We also put the issue of the hearsay issue. And she sat through both trials, and in particular this trial. And her feeling, or her finding was that she believed that this evidence was so key to tying together the pieces of the government's case. Particularly in the absence, you know, many times in a case like this, you'd actually have some proof of fraud. Maybe somebody made some kind of statement to somebody, or you'd have some kind of insider who says something. Or you'd have the fact that evidence of payment for the prescription. You don't have that here. And what Judge G said was that she believed that without that testimony, that it was essential to the government's case. And so, I would say that absolutely, that it can't be shown to be harmless. And so, the government brought this again home in their rebuttal closing. It says, and defense counsel mentioned this idea that it's pretty easy to qualify for a power wheelchair. If it's so easy to qualify for a power wheelchair, then why don't legitimate DME suppliers regularly sell them? Remember, you heard that from Special Agent Koontz. That's a key piece of evidence. And they're saying, you know, that number of wheelchairs sold, and he's saying, we get this information from Keith Koontz. But he had no basis for saying the number of wheelchairs. It's not within his ambit of expertise to testify about it. And that's what makes this particular issue easier than it would be in other cases. I just want to give you a friendly reminder that you're down to less than 10 minutes. Oh, okay. To reserve time for counsel. Did Judge Gould have a question? Judge Gould? At some point in the argument, would you address restitution issues? Oh, Ms. Young will address that. And then, let's see. Now, as far as the letters, we say that that's hearsay. These are letters from 2009. They're prejudicial. They had to do with what the government argues were assessments. An assessment made by Medicare, basically a finding that there were that... You're talking about the overpayment notices? The overpayment letters, right. And so the question is, the way in which this was charged as separate executions of a scheme in 2008, delivery of five wheelchairs in 2008, that because that's a separate execution, they're complete in 2008. And so, therefore, the letters in 2009 were not admissible. The way the government argued it was saying, well, the indictment talked about going to 2009, and the scheme went into 2009, but the way it's charged, the offense is complete in 2008 because of the way it's charged. So, bringing in on the issue of notice in 2009 is not admissible. But even if it were, just the fact that there's this letter would not be sufficient. And so, because there's a danger that it could be misused, and it was, in fact, referenced in closing, it would be hard for the jurors to cabin that off. Wasn't there limiting instruction given? There was a limiting instruction. The government also argued that it's relevant to knowledge because after receiving the letters, the scheme continued in the same manner. So, on a views of discretion view, I think you have a tough time on that argument. Well, the thing is, but that's not how it was argued. They didn't argue well. It relates back to that. And I would say that it's 403. But aside from that, another reason why it really is prejudicial is that testimony came out that 94% or so, in the year 2013, it was something in the 90%, Medicare basically said that the power wheelchair claims were improper. And it's a huge number that, at least on first pass, they found to be improper. And so, just because you get a letter doesn't mean that it's fraudulent. Just a quick question. Yes. So, the letters came in 2009, right? Correct. But the request for payments were made before 2009, isn't it? Well, the claim was submitted, but they didn't receive, it was submitted on the issue of notice, but the notice wasn't received until 2009. Okay. Let's hear from Ms. Young. Thank you. Thank you, Your Honor. It's Catherine Young for Defendant Aniazi-Smith.  And I wanted to focus on the argument that there's insufficient evidence to support Ms. Aniazi-Smith's conviction. But in light of Judge Gould's question, I also wanted to turn to the issue of restitution. And one of our arguments in that respect is that since there's no evidence that Ms. Aniazi-Smith committed fraud with respect to any of these counts, then the judge's imposition of restitution, without focusing directly on Ms. Aniazi-Smith's specific conduct, because the restitution statute requires the court to focus on a person directly harmed by the defendant's criminal conduct. But this was a scheme, right? Yes, but nonetheless, I'm sorry, I didn't mean to interrupt you. And so consequently, there were lots of people involved, including, so how do we determine who was harmed by which person involved in the scheme? How do we determine that? How would the trial court do that? The statute requires the judge to focus on the defendant's conduct. So in this case, we're arguing that the court should have looked to what Ms. Aniazi-Smith actually did. What claims that she submitted were fraudulent? What damage, what did she actually do that harmed one of the victims? And we're arguing that the court was required to do that analysis, as the statute requires, in terms of imposing restitution rather than imposing blanket restitution across the board. Now, Judge Gould, have I addressed your concern? Or do you have another question about restitution? I thought, one question I had was, I thought that some of the restitution award, over periods of time, when it was not involved, although maybe the scheme, it dated her involvement. Well, that's right. We attacked, in the briefs, we attacked the restitution on various grounds. First, that it certainly was beyond the counts of conviction. It was also beyond the statute of limitations, and we argued that restitution should be precluded for executions which are beyond the statute of limitations. So there were a number of different challenges to restitution. Are you aware of any case, whether from our circuit or anywhere in the country, that basically says imposing restitution for conduct caused beyond the statute of limitations is not permissible? I couldn't find a case in this context, Your Honor. Now, I wanted to focus briefly, and reserving some time for rebuttal, on the fact that there was insufficient evidence to support Ms. Aniazi-Smith's conviction. The government was required to prove that she acted with knowledge that her conduct was unlawful, beyond a reasonable doubt. They were required to prove that she acted with the intent to cheat or deceive, and that she knew, in fact, that the claims were fraudulent. The evidence shows that Aniazi-Smith and Mr. Garba started ITC because Mr. Garba had a relative who needed a wheelchair. They both signed Medicare certifications. Garba claimed that he was in charge of operations, billing, and customer service. At the time, Aniazi-Smith had four jobs. She worked at ICC Auto, she had her own accounting firm, she had her family, and the evidence established her involvement in the billing was very limited. She only billed in 2007. She only had 11 billings for PWCs. She only conducted three deliveries, and each one of those had a completed health assessment form. The evidence showed that ITC had prescriptions, valid prescriptions, for wheelchairs. They purchased wheelchairs, they delivered wheelchairs, there were no complaints, and therefore there was no basis for any inference that Aniazi-Smith did not believe that ITC was a valid operation. And Aniazi-Smith's actions indicated that she did believe that the documentation was legitimate. There was an evidence that, with respect to beneficiary JL, she returned a Medicare payment because of an overpayment letter. She contacted Medicare, sent supporting documentation to justify the claim, and Medicare then reversed the overpayment letter and returned the funds. Therefore, there was no evidence that she was on notice, let alone that she knew that the claims submitted by ITC were not medically necessary, and that the PWCs were not delivered. And since I only have two minutes left, I want to reserve time for rebuttal, unless there are any questions. No, thank you. Thank you. I have one question. On the issue that was raised by Judge Wynn's question, I thought that there might be a Seventh Circuit case that has awarded restitution outside this normal statutory limitation. Your Honor, I could not find a case in this context.  Thank you. Thank you. There is a case, I think, out of the Eleventh Circuit, but it goes the opposite way that says that imposing loss outside the statute is permissible. Counsel? Good morning, Your Honor. May it please the Court, Joseph Axelrod on behalf of the United States. Your Honor, I want to be clear. This Court should affirm the convictions and sentences of both defendants. I want to use my time most effectively today by addressing a couple of the issues that were raised by the defendants today, and in order, the sufficiency argument, the argument related to modus operandi testimony, and then the overpayment letters. But, of course, if Your Honors have any additional questions. Your Honors, just take me a step back for a minute, addressing the sufficiency argument first. The jury heard all of this evidence. The jury heard, as counsel just recited, all of Defendant Amiazi-Smith's various mitigation, the fact that she had four jobs, there are various explanations for their conduct. The jury heard this evidence and returned guilty verdicts. The jury also heard evidence that, for instance, the defendants did billings for power wheelchairs to Medicare before prescription dates. Billings to power wheelchairs, billings for power wheelchairs before delivery. Deliveries of power wheelchairs before prescription dates. This is the evidence that the jury heard. As to Defendant Amiazi-Smith, Your Honors, the jury also heard evidence that Defendant Amiazi-Smith picked up prescriptions directly from one of the dirty medical clinics that was introduced into evidence. The jury heard evidence that Defendant Amiazi-Smith picked up prescriptions from the Advanced Medical Clinic on Woodman Avenue in Van Nuys. This particular medical clinic was the same medical clinic that wrote the prescriptions for all five count beneficiaries. All five count beneficiaries who had prescriptions from Dr. Matthew Gutierrez, who testified at trial and testified that his clinic was essentially a power wheelchair prescription mill. Defendant Amiazi-Smith personally picked up prescriptions from that clinic. The jury also heard evidence of the extraordinarily large cash withdrawals being made from the Defendant's accounts. The jury heard Defendant's own forensic accountant unable to explain all of these monumentally large cash withdrawals. The jury saw 24 examples of identical word-for-word font typeset progress notes throughout the patient files. Eleven instances of couples billed for power wheelchairs. Couples. Married couples billed for power wheelchairs. Some of them the same time, on the same day, by the same doctor. In fact, two of the five count beneficiaries referred to in the briefing as CG and HG, which were Clementina and Hildeberto Guillen. They both got power wheelchairs on the same day from the same doctor. And both of them walked into court. Both of them testified that they never got a home assessment performed at their house. Never visited the Defendant's company, ITC. And to the point raised by defense counsel just a moment ago that Defendant Amiazi-Smith performed home assessments, a jury heard from beneficiaries JG and JA, Jose Ayala and Jose Garcia, two of the beneficiaries for whom Defendant Amiazi-Smith signed home assessment forms, that nobody performed a home assessment at their home at the time that the power wheelchair was delivered. Defendant Amiazi-Smith was the CEO. She was the co-founder. She was the billing. She did the billings. She was herself a certified public accountant. She was squarely in the middle of all of this, as was Defendant Garba, who did the billings and the deliveries for all five count beneficiaries and who would have seen, just as the jury did, the beneficiaries who testified walk into court. The evidence in this case was more than sufficient for the jury to infer that the defendants knew exactly what they were doing. This was a fraud. It was a fraud, plain and simple, and the defendants were, for a period of time, quite successful at their fraud. I'd like to turn to, Your Honors, the question of modus operandi testimony. The modus operandi testimony of Special Agent Keith Koontz was admitted at trial after a significant amount of pretrial litigation, supplemental notices, and Special Agent Koontz testified to the permissible methods and techniques, the business operation, of a fraudulent durable medical equipment supplier. And if I can draw, for Your Honors, just a little bit of contrast, a case that Your Honor is familiar with, United States v. Wells, was a case that dealt with impermissible profile evidence, and that, I think, provides a really sharp contrast to the modus operandi testimony in this case. United States v. Wells was a recent decision that dealt with a double homicide up at the Coast Guard Station in Kodiak, Alaska. And in that case, the government presented testimony of a forensic psychologist who talked about sort of classic profile testimony, the particular type of person that commits a particular type of crime. In that case, of course, the particular type of person that commits workplace violence, a homicide. And then the government argued, in that case, that the defendant's characteristics married up perfectly with that profile. That case is totally distinct from what we have in this case. Special Agent Kuntz didn't testify about the defendants, didn't testify about the allegations and the indictment, didn't testify about the investigation. He was wholly separate from that case. What he testified to was his long and varied experience, I believe over 200 healthcare fraud investigations involving durable medical equipment suppliers into healthcare fraud generally, and testified to the methods and techniques, the business operation, of a fraudulent durable medical equipment supplier. Counsel raised during the opening argument the notion that fraudulent durable medical equipment suppliers, or, excuse me, legitimate durable medical equipment suppliers may only bill for power wheelchairs every so often, but fraudulent durable medical equipment suppliers were more likely to bill for this very high-value item more often. That was only one of the numerous methods and techniques, the processes, that Special Agent Kuntz described for the jury that were common to those involved in durable medical equipment fraud. And very similar to the drug trafficking context, the modus operandi testimony in this case talked about just those sort of benign, seemingly innocuous observations that, when sort of taken together, can indicate the presence of criminal activity. Just like in the drug trafficking context, where you have, for instance, a drug trafficker or courier coming through an airport, modus operandi testimony might talk about how that particular person or the people who are engaged in that sort of conduct might carry with them a large amount of cash, might have plastic bags, scales, an itinerary that they're traveling to various different locations and staying for only a short amount of time, staying in their destination for only a short amount of time, may have a suitcase with a false bottom and a false top. Those are the methods of operation, the techniques used by a drug trafficker. Very different would be the impermissible profile testimony, where, in that case, some expert may talk about how a particular person of a particular ethnicity from a particular origin country who has a certain financial station in life is more likely to commit drug trafficking. As I understand it, part of Defense Counsel's argument attacking Agent Kunz's testimony is specific as to his testimony regarding legitimate DME businesses to say that, well, legitimate DME businesses wouldn't have these particular characteristics. And so, therefore, legitimate DME supplier is indicative of fraud. And at the same time, they're saying it's almost a foundational challenge that Agent Kunz doesn't have the necessary expertise because his exposure to legitimate DMEs was very limited. Can you address that point in particular? Certainly, Your Honor. So, as to the broader point of the discussion of legitimate durable medical equipment suppliers, Special Agent Kunz described what he did, but did so just as a backdrop, just as a reference point and some context for the jury in order to understand what is a relatively foreign concept for, I think, most average jurors. Interactions with Medicare, interactions with durable medical equipment suppliers, and the billing of durable medical equipment to Medicare. As to Special Agent Kunz's experience and experience with legitimate providers, with legitimate conferences, but more importantly, Special Agent Kunz had, I believe, over 200 investigations investigating healthcare fraud and durable medical equipment fraud. And it's from that that he would generate the, I think, very fulsome experience with what a legitimate durable medical equipment provider does. Because investigating fraud and crime in that context over and over and over again, you undoubtedly develop and Special Agent Kunz was able to describe to the jury that typically speaking, a durable medical equipment company would have normal store hours, would have employees, would have a variety of durable medical equipment, and that is so they can service their patients. And the government then argued that the various facts of this case were similar to the methods of operation that Special Agent Kunz described of a fraudulent medical equipment provider. Special Agent Kunz described how there's a need for Medicare beneficiaries, once they receive a prescription, to go to the power wheelchair company or the durable medical equipment provider in order to be fit with a power wheelchair that accommodates them, that fits their particular ailments. For example, you wouldn't give an extra wide power wheelchair to a very slight person. You wouldn't give a very narrow power wheelchair to a much larger person. And to a person, every beneficiary that testified testified that they never went to the defendant's company. They never visited the defendant's company. They just had a power wheelchair plopped down in front of their house. What the beneficiaries in this case testified to was a process in which they were approached by someone who showed up out of the blue, subjected them to some sort of high-pressure tactic about how power wheelchairs were no longer going to be offered. They were then carted down to one of these dirty medical clinics where they were ostensibly given prescriptions for power wheelchairs by someone who wasn't their primary care physician. And to a person, not any of them ever got a prescription from one of these doctors or physician's assistants, but those prescriptions showed up and they were provided. Let me ask you a question about that, though. So there were five specific instances or occasions that were proven, but there were over 500 claims, right? So over 500 wheelchairs were provided, right? Is it true that all 500 of those folks who received these electric wheelchairs did not get what they should have had and a wheelchair that suited their particular disability? Well, Your Honor, I believe between January 2006 and November 2009, I believe there were 229 power wheelchairs that were billed by the defendants to Medicare. As it happens, there was only evidence that the government could turn up of 204 power wheelchairs that were purchased by the defendants. So there was already a pretty significant discrepancy between the ones that they billed for and the ones that they actually purchased themselves in order to provide. But what the government argued and what the evidence bore out at trial was that Medicare beneficiaries were being provided to the extent that they ever got power wheelchairs with power wheelchairs that were medically unnecessary by Medicare standards. There were Medicare beneficiaries in this case who had medical histories, who had ailments, but they did not necessarily qualify pursuant to Medicare's rules of medical necessity for power wheelchairs. And there was evidence that that is true as to all 240? The government selected a wide variety of beneficiaries to put on at trial and then pointed out throughout the patient files the various different inconsistencies, omissions that existed. So, for instance, out of all the patient files that were billed to Medicare, 123, I believe, were missing the necessary home assessments. The government, I think, put on a fulsome case about the fraud that existed throughout the patient files in the sense that I believe 99 percent of the patient files contained a limitation of liability form, a form that suggested to the or, excuse me, explicitly stated to the beneficiary that ITC did not believe that it was made reasonable or necessary and that if Medicare denied the claim, they would be on the hook for $4,000 each. So that was, what, 120? Is that what you said? That limitation of liability form was, I believe, in 99 percent of the patient files. Of the 240? 229. 229, okay. And when they were asked on the stand, these beneficiaries, for one, all the beneficiaries that the jury heard from were Spanish-speaking, they all said no. And when they were all told that what these forms said, that they would be on the hook for $4,000 if Medicare denied their claim, every one of them to a person said, we would never have accepted this had we known this stuff. So the reason why I ask those questions is because it seems to me that that's relevant to the issue of restitution. Your Honor, as to restitution the defendants are on the hook for not just what is reasonably foreseeable but the direct and proximate cause of their harm. And to the extent that the defendants are now making this novel argument about statute of limitations or that they should only be held responsible for the executions of the fraud, that's not supported by the case law. It's not supported by this court's jurisprudence in Thompson, in United States v. Grice. The defendants are on the hook for the entire scheme. If the defendant is paying $1.7 million worth of power wheelchairs to Medicare and receiving back over $897,000 worth of reimbursement, that is the defendants proximate cause, excuse me, proximately caused harm to Medicare. And Medicare, as the victim in this case, is entitled to the full amount of the restitution. If I could, Your Honor, if I could just turn in the last few minutes I have remaining to the overpayment letters. The overpayment letters that were admitted into evidence, as Your Honor, Judge Wynn pointed out, were the subject of a proper limiting instruction. And the defendants claim now of prejudice presumes that the jury didn't follow the court's proper limiting instruction. That's an argument that is entirely unsupported by the record. The court instructed the jury that these particular letters, this particular evidence, was only admitted for notice, not for its truth. It was admitted for that limited non-hearsay purpose. The overpayment letters were not only evidence, though, of the defendants' knowledge and intent in engaging in the scheme, but they were evidence of the overall scheme itself. The defendants have, again, this novel argument about how the government's case should be cabined to the five executions of the fraud. As the statute itself requires, 13, excuse me, 18 United States Code Section 1347 requires, among its elements, the proof of a scheme to defraud. The government charged a scheme that began in January of 2006 and concluded in November of 2009. And the government had to prove that scheme. And the overpayment letters themselves did post-date the executions, but this court has routinely admitted subsequent conduct as evidence in United States v. Benchwick and Bebo Rodriguez. This court has routinely admitted that. But the scheme continued even after the overpayment letters began to be received. The first overpayment letter was received in May of 2009. And in the government's supplemental excerpt of record, three patient files are included. And those patient files post-date the first overpayment letters. I believe there's a patient file there from August of 2009, well after the first overpayment letters received. So the scheme continued despite the defendants being on notice that Medicare had real questions about their delivery and medical necessity. And the patient files that post-dated the May overpayment letter had the same indicators of fraud that the government expert testified about? I have to look back at them specifically, but again, I think they all included the limitation of liability forms. And it's the government's contention, Your Honor, that the fraud pervaded the defendants' engagement with Medicare. Not only because they all had these limitation of liability forms, but because the defendants were involved in an overall scheme in which they were working with these dirty medical clinics, these power wheelchair prescription mills, to obtain power wheelchair prescriptions while bypassing the beneficiaries and billing these high-value power wheelchairs to Medicare every time with the fully loaded package of accessories without any sort of concern about the beneficiaries themselves and whether they needed this particular accessory or that particular accessory. This was a scheme to defraud Medicare that, again, was quite successful for a good chunk of time. All right. Before you wrap up, let me check in with Judge Gould and see if he has any questions for Government Counsel. Judge Gould? Judge Gould? Can you still hear us? Did we lose him? All right. Well, let's pause to make sure that he's still on the line and has an opportunity to hear both of your arguments. Judge Gould? Judge Gould, can you hear me? Judge Gould, can you hear me? Judge Gould, can you hear me? Hello? Judge Gould? Glad that you're able to rejoin us. Do you have any questions for Government Counsel? He's about to wrap up. Thank you. Thank you, Your Honor. Before you begin, let's split rebuttal time. We have a minute for each counsel, please. Thank you, Your Honor. Your Honor, the Court asked Government Counsel about the testimony about the legitimate setting, and it wasn't offered just as backdrop. It was, if you look to the actual closing argument, after the listing of all the ways in which it doesn't fit, the legitimate, they were saying that this, essentially, they're pointing to that as evidence of guilt, and these are all the ways in which you heard from Special Agent Keith Coons about the red flags of health care fraud. As far as the missing home assessments, if you look on ER 1319, it says that the requirement of any kind of writing of a home assessment was not in place in 2008, and that came into place later, so that would not have applied to any of the claims here. In terms of the limitations of liability, that's something that is done in every case because without that, a claim cannot be made from the individual to either return the power wheelchair or to require payment if Medicare doesn't pay, and therefore, that's not an indication of fraud. All right. Thank you, Counsel. Thank you, Your Honors. I just want to focus briefly on the things that the prosecutor said about Ms. Aniazi-Smith. First of all, he talked about billings that were before the prescription date or before delivery. There was evidence that there were some wheelchairs that were billed before the delivery date, but in those cases, there was evidence that the date that it was billed, the wheelchair was sent out. If the person wasn't there to receive the wheelchair, another delivery attempt was made and another delivery attempt was made. Even though it was billed, they still made numerous attempts and they succeeded in obtaining delivery in all of those cases. Every wheelchair that was billed was delivered, so there's no evidence that that was fraud. Also, the prosecutor said that Ms. Aniazi-Smith picked up prescriptions from AMC. There was no evidence that she should have known that there was anything wrong with AMC. The government presented the testimony of Dr. Gutierrez, a Yale-trained physician who was head of the St. John's Pain Management Clinic. He testified that he worked there for six months before he noticed that there was anything amiss there. He said there were waiting rooms, labs, files, examination rooms. It looked legitimate. There was no reason why she should have known that there was anything wrong there. With respect to cash withdrawals, there was evidence and our forensic accountants talked about this, that ITC had an auto business. They needed cash because they had to have cashier's checks in order to bid on these autos at autobroad bridges. He also talked about identical progress notes and couples. Again, she was only involved in a few limited billings. She wasn't involved in those billings.
judges: Gould, Nguyen, Benitez